[Cite as *In re D.L.*, 2012-Ohio-1796.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# CRAWFORD COUNTY

IN THE MATTER OF:

                                     **CASE NO.  3-11-08**

    D.L.,

                                     **O P I N I O N**

ALLEGED DELINQUENT CHILD.

Appeal from Crawford County Common Pleas Court
Juvenile Division
Trial Court No. A 2102520

Judgment Affirmed

Date of Decision:   April 23, 2012

APPEARANCES:

    *Randall E. Fry*  for Appellant

    *Stanley Flegm and Michael J. Wiener*  for Appellee

**SHAW, P.J.**

{¶1} Defendant-Appellant, D.L., appeals the judgment of the Court of Common Pleas of Crawford County, Juvenile Division, adjudicating him a delinquent child on one count of rape.

{¶2} On December 10, 2010, the Crestline Police Department filed a complaint alleging that D.L. was a delinquent child on one count of rape in violation of R.C. 2907.02(A)(2), a felony of the first degree if committed by an adult, and in violation of R.C. 2152.02(F). D.L. subsequently entered a denial to the complaint.

{¶3} The case proceeded to a bench trial on February 4, 2011. At trial, the parties stipulated to the fact that sexual intercourse occurred between D.L. and K.J. The only remaining issue for the trial court to determine was whether the sexual intercourse was committed by D.L. purposefully compelling K.J. to submit by the use or threat of force.

{¶4} The State presented the testimony of K.J. The defense presented the testimony of Officer Travis Salyer, Officer Justin Butler, and D.L. K.J. testified that she is in eighth grade and is fourteen-years-old. K.J. explained that she knows D.L. because they attend the same high school. She testified that she had contact with D.L. during the afternoon on August 8, 2010 by sending instant messages to each other on Facebook. She testified that they were sending messages to each

other for about fifteen minutes during which D.L. asked her to sneak out of her house and meet him at Kelly Park. During this conversation on Facebook, K.J. agreed to meet D.L. at Kelly Park later that night.

{¶5} K.J. testified that she met D.L. at Kelly Park that night. She explained that she left her house after midnight without the knowledge or permission of her parents. When she arrived at the park, she saw D.L., and they walked over to the hill and sat down. She testified that they were talking when a car drove by. K.J. explained that she and D.L. decided to move to a different location over the bridge near the riverbank because they did not want to get caught for being out past curfew.

{¶6} K.J. testified that she and D.L. sat down near the riverbank and were talking a while longer when she told D.L. that she wanted to leave. K.J. recalled that D.L. asked her to stay just a little bit longer, so she stayed for another five minutes. K.J. testified that she again told D.L. she wanted to leave and attempted to get up from the grass by getting up on her knees. D.L. then gave K.J. a hug and again asked her to stay longer. K.J. agreed to stay for a couple more minutes and then again attempted to leave. K.J. recalled that at this point she was only on one knee and D.L. had pulled her arm down, causing K.J. to lose her balance. K.J. testified that D.L. then began kissing her and she could not get up from the ground because D.L. was much bigger than her and her attempts to push him off of her

were futile.[1] K.J. testified that D.L. then covered her mouth, held her down by applying pressure, and told her to be quiet.

{¶7} K.J. described in detail that D.L. started to undress her, first taking off her shirt by pulling her tank top down and taking her arms out. She recalled that D.L. then let go of her mouth and she tried to get up, but D.L. put her hands above her head, pushed her back on the ground and told her to be quiet. D.L. then continued to take off K.J.'s shirt. After he removed her shirt, D.L. started to remove K.J.'s shorts and underwear. K.J. testified that once he pulled down her shorts and underwear, D.L. then undressed himself.

{¶8} K.J. recalled that at this point D.L. "backed off of [her]" but kept covering her mouth with his hand. (Trial Tr., p. 14). She also explained that D.L. had backed off of her to take off her shorts and underwear. However, K.J. maintained that she could not sit up due to the pressure D.L. was applying while he covered her mouth. After he undressed himself, K.J. recalled that D.L. then "started to rape [her]." (Trial Tr., p. 15). K.J. testified that she did not give D.L. consent to have sexual intercourse with her. K.J. recalled that after D.L. raped her, she got dressed and started to walk away. K.J. testified that D.L. repeatedly told her to "not say anything" and that what happened was between the two of them. (Trial Tr., p. 15).

---

[1] According to the testimony at trial, K.J. weighs 140 pounds and D.L. is six feet tall and weighs 265 pounds.

{¶9} Shortly thereafter, the teenagers were approached by a police officer in the parking lot of the park. K.J. testified that D.L. talked to the officer, who took D.L. home, and that another officer was called to the park to take K.J. home. When K.J. arrived home, she woke up her mother. The officer told K.J.'s mother that K.J. was out past curfew with D.L. K.J. admitted that she told neither the officer nor her parents about the rape that night because she was in shock that something like that had actually happened to her and she was scared. K.J. recalled that her parents then yelled at her for being out past curfew and she went to bed. K.J. testified that as her punishment for violating curfew, she "had to clean the house and was grounded from everything." (Trial Tr., p. 17).

{¶10} On cross-examination, K.J. testified that prior to the incident she and D.L. were friendly at school and said "hi" to each other in the hallways. K.J. explained that most of their interaction was on Facebook once every two weeks. K.J. testified that her last contact with D.L. on August 8, 2010, was on Facebook at 3:00 p.m. and that she did not have any further communication with him prior to meeting him at the park.

{¶11} K.J. then gave more detailed testimony about her and D.L.'s interaction with the police officers after the alleged rape had occurred. She recalled that Daniel told the police officers that he and K.J. were just "talking." K.J. explained she then told the officers the same thing because she was scared.

K.J. remembered the officers shining a flashlight on her and D.L. She testified that they talked with the police officers for five to ten minutes. K.J. estimated that she rode in the back of the police cruiser for two to three minutes before arriving home. K.J. recalled the police officer talked to her mother and gave her a warning for violating curfew.

{¶12} K.J. testified that on the morning of August 9, 2010, her parents made her do house work as punishment for violating curfew. She went to volleyball practice for two hours during the day, and when she got home she did more chores. She stated that she finally told her parents about the rape around 5:00 p.m. on August 9, 2010, because her father was asking her questions about D.L. and his age. Shortly thereafter, she reported the rape to the police. She also testified that she did not say anything to her friends at volleyball practice because she did not want them to judge her. The State then rested.

{¶13} Officer Travis Salyer of the Crestline Police Department testified that he was working on August 9, 2010, from midnight to 8:00 a.m. He testified that when he arrived at Kelly Park, he saw D.L. and K.J. standing on the sidewalk together and then attempt to hide from him by going behind a building. D.L. then approached him and told him that nothing was happening, and that the two met at the park because they had had a fight earlier on the internet. Officer Salyer then called out to K.J. and she walked out from behind the building. He testified that

he informed the teenagers it was 1:00 a.m. and they were both out past curfew. Shortly thereafter, Officer Butler arrived at the park.

{¶14} Officer Salyer testified that K.J. appeared normal, was not crying, and had no unusual marks, did not appear to be shaken, scared, or upset, but acted as if she was trying to hide but got caught. He testified that he talked with her for about ten to fifteen minutes and then took her home. He stated that on the way home, K.J. told him that she and D.L. were just talking and that nothing out of the ordinary happened. Officer Salyer testified that once they arrived at K.J.'s house, he escorted K.J. to her front door and informed her mother that K.J. was caught violating curfew. He explained that he only gave K.J. a warning because that was the first time he had been involved with her. Officer Salyer verified that at that point there were no accusations of rape and he was just handling the situation as a curfew violation.

{¶15} Officer Justin Butler of the Crestline Police Department testified that he was working on August 9, 2010, from midnight until 8:00 a.m. He testified that he received a phone call from Officer Salyer reporting two suspicious people in Kelly Park and that when he arrived at Kelly Park, Officer Salyer was talking to two people. Officer Butler explained that they checked the area because there had been recent problems with people vandalizing the park. He then spoke with D.L. and took him home because he was in violation of his curfew. Officer Butler

testified that he observed K.J. and that nothing seemed out of the ordinary, but admitted that he mostly interacted with D.L. and did not talk very much to K.J. Officer Butler also testified that at the time he did not think that anything else besides a curfew violation had taken place and that he had arrived to the park simply to ensure that no vandalism was done to the park.

{¶16} D.L. was the next witness to take the stand. D.L. testified that he knows K.J. through school and Facebook. He testified that during their conversations on Facebook, they discussed meeting up and going for a walk. He stated that in those conversations he asked her what sorts of activities they would be doing, and that she responded that "it wasn't really a big deal if [they] had anything sexual going on. She said that she's done it before, so there wasn't a really big deal about it." (Trial Tr., p. 46). D.L. testified that during the Facebook conversation that took place on the afternoon of August 8, 2010, he asked K.J. if she wanted to get together later that night, and that she responded that she would have to wait for her parents to fall asleep before she could leave the house. D.L. stated that later that night he received a phone call from a restricted number, which was K.J., saying that she should meet him at the park. D.L. recalled that K.J. had just called him that one time. D.L. told her that he would like to meet somewhere else, but that K.J. said it was too far for her and that they ought to meet halfway, which was Kelly Park.

{¶17} D.L. recalled riding his bike to the park around 12:15 or 12:30 a.m. When he met K.J., they went over on a hill and sat in the grass for about ten to fifteen minutes. D.L. testified that they were talking and kissing, and he asked her if "this was going to go any farther if she wanted to move somewhere more private" and she agreed. (Trial Tr., p. 48). D.L. explained that they then moved across the bridge and down to the riverbank. D.L. recalled that when they sat down in the new spot, they were kissing again and then she undressed herself and "climbed on top of [him]." (Trial Tr., p. 49). He testified that he did not get undressed, but that he had sex with her. D.L. testified that he never held K.J. down because she was on top of him. After they were finished, she got dressed and said she had to go home. D.L. admitted that he told K.J. to keep their sexual relationship a secret between the two of them. However, D.L. maintained the sex was consensual.

{¶18} They walked up the hill and saw Officer Salyer. D.L. testified that he told Officer Salyer that he and K.J. were just talking and that they had a fight on Facebook earlier that day and just wanted to clear things up. D.L. admitted to making up the story about the fight because he did not want to get in trouble for violating curfew. He stated that they were talking to Officer Salyer when Officer Butler arrived, and that Officer Butler loaded up his bike in the car and took him

home. D.L. testified that he and K.J. were in the park for approximately forty-five minutes to an hour prior to their encounter with the police officers.

{¶19} On cross-examination, D.L. testified he is sixteen-years-old and a junior in high school. D.L. explained that this was the first time he met up with K.J. D.L. recalled that K.J. called him around 12:04 a.m. on August 9, 2010, and shortly thereafter he left his house and met her at the park around 12:15 a.m. The State introduced D.L.'s phone records indicating that he received calls at 12:31 a.m. and 2:10 a.m. from an unavailable number. After cross-examination, the defense then rested.

{¶20} On rebuttal, K.J. testified that she did not have a cell phone on the date in question, that her parents do not have a cell phone, and that no one in the household has a phone.

{¶21} The juvenile court found that the "[a]llegations of complaint [are] sustained by the degree of proof required by Juv.R. 29(E)(4)."[2] (JE, March 4, 2011). The court stated the following from the bench.

> **Well, it is true, obviously, the testimony of the two individuals involved are in direct opposite as to what was presented. The [c]ourt obviously has to look outside of that testimony for potential cooperation (sic), that which is going to lend credibility to what has been presented. And the critical element is the testimony of [K.J.] was that the last urging to meeting (sic) at**

---

[2]The dissent erroneously suggests that the trial court may have failed to apply the correct burden of proof beyond a reasonable doubt to this case. This allegation is inaccurate. In its Findings and Judgment Entry the trial court specifically stated that "the allegations of the complaint were sustained by the degree of proof required by Juv.R. 29(E)(4). Juvenile Rule 29(E)(4) directs the court to "[d]etermine the issues by proof beyond a reasonable doubt in juvenile traffic offense, delinquency, and unruly proceedings * * *."

> **Kelly Park was at the Facebook entry at 3:00 p.m. And the reverse of that was that there was a telephone call from [K.J.] at approximately 12:04, when the testimony indicates that she did not have access to a cell phone to be placing that call, which would obviously retract the testimony of the youth and to the credibility of [K.J.]**
>
> **The testimony was essentially that there was force involved in the occurrence, and obviously the testimony does indicate that there is a considerable discrepancy between Mr. [D.L.]'s size and [K.J.]'s size. But based upon what has been presented, the [c]ourt does find that [K.J.] was more credible, and the [c]ourt does find [D.L.] to be delinquent by reason of the rape.**

(Tr. Trans., p. 60-61.)

{¶22} The juvenile court held a dispositional hearing on March 4, 2011, after which it placed D.L. on a period of indeterminate intensive probation, reserving the matter of sex offender registration until completion of a sex offender assessment. It is from this finding of delinquency that D.L. appeals, presenting the following assignments of error for our review.

**ASSIGNMENT OF ERROR NO. I**

**THE DELINQUENT CHILD'S/APPELLANT'S ADJUDICATION OF BEING A DELINQUENT CHILD BY REASON OF RAPE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR NO. II**

**THE DELINQUENT CHILD'S ADJUDICATION OF BEING A DELINQUENT CHILD BY COMMITTING RAPE WAS NOT SUPPORTED BY THE EVIDENCE.**

{¶23} Due to the nature of D.L.'s assignments of error, we elect to address them out of order.

*Second Assignment of Error*

{¶24} In his second assignment of error, D.L. argues that the judgment was not supported by sufficient evidence.

{¶25} When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, citing *State v. Jenks,* 61 Ohio St.3d 259 (1981), superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89. Sufficiency is a test of adequacy, *State v. Thompkins*, 78 Ohio St.3d 380, 386, and the question of whether evidence is sufficient to sustain a verdict is one of law. *State v. Robinson*, 162 Ohio St. 486 (1955), superseded by state constitutional amendment on other grounds as stated in *Smith*.

{¶26} Revised Code Section 2907.02(A)(2) sets forth the offense of rape as, "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Revised Code Section 2901.01(A)(1) defines force as, "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."

{¶27} K.J. testified that the sexual conduct in this case was achieved by D.L. pulling her down to the ground, holding her down by putting his hand over her mouth and applying his body weight on her. Based on this testimony and the stipulation of sexual conduct, we find that, viewed in a light most favorable to the prosecution, a rational trier of fact could have found that elements of rape were proven beyond a reasonable doubt.

{¶28} Accordingly, D.L.'s second assignment of error is overruled.

### First Assignment of Error

{¶29} In his first assignment of error, D.L. argues that the judgment was against the manifest weight of the evidence. Specifically, D.L. argues that the State presented no evidence to corroborate K.J.'s testimony, and further that the evidence does corroborate D.L.'s testimony.

{¶30} When an appellate court analyzes a conviction under the manifest weight standard it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387, superseded by constitutional amendment on other grounds as stated by *Smith,* 80 Ohio St.3d 89, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1983). A new

trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. *Id.*

{¶31} However, the role of the appellate court is to engage in a *limited* weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. *Thompkins*, supra, at 390, (Cook, J., concurring) (emphasis added). The reviewing court must defer to the factual findings of the trier of fact as to the weight to be given the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, paragraph one of the syllabus (1967). The underlying rationale for deferring to the trier of fact is that the trier of fact is best positioned to view the witnesses, to observe demeanor, gestures and voice inflections and to use those observations to weigh witness credibility. *See Myers v. Garson*, 66 Ohio St.3d 610, 615, (1993); *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶32} Furthermore, we note that, " 'ninety percent of the total meaning of testimony is interpreted through non-verbal behavior, such as voice inflections, hand gestures, and the overall visual demeanor of the witness. The witness' choice of words accounts for only ten percent of the meaning of their testimony.' " *State v. Brown*, 3d Dist. No. 1-10-31, 2011-Ohio-1461, ¶ 51 quoting *State v. Evans*, 67 Ohio St.3d 405, 410–11 (1993). Thus, the decision whether, and to

what extent, to believe the testimony of each witness is within the province of the factfinder. *State v. Key*, 2d Dist. No. 22609, 2009–Ohio–422, at ¶ 25.

**{¶33}** Moreover, a defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was offered at trial. *State v. Campbell*, 10th Dist. No. 07AP–1001, 2008–Ohio–4831, at ¶ 23. The trier of fact is free to believe or disbelieve any or all of the testimony presented. "In the event that the evidence is susceptible to more than one interpretation, a reviewing court must construe it consistently with the trial court's judgment." *Gerijo, Inc. v. Fairfield*, 70 Ohio St.3d 223, 226 (1994). Therefore, this Court must not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently clear that the finder of fact lost its way. *State v. Parks*, 3rd Dist. No. 15–03–16, 2004–Ohio–4023, at ¶ 13.

**{¶34}** The trial court adjudicated D.L. as a delinquent child by the commission of rape. As previously mentioned, R.C. 2907.02(A)(2) defines rape as "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

**{¶35}** The only issue for the trial court to determine was whether D.L. purposely compelled K.J. to submit by force or threat of force because at trial the parties stipulated to the fact that K.J. and D.L. engaged in sexual conduct at Kelly Park. In rendering its decision, the trial court acknowledged that D.L. and K.J.

presented two irreconcilable accounts of the events that took place at the park. The trial court explained that it had to "look outside of [D.L.'s and K.J.'s] testimony for potential [corroboration], that which is going to lend credibility to what has been presented." (Trial Tr., p. 60). The trial court specifically stated that it found the testimony of K.J. to be more credible. The questionable testimony of D.L. alleging certain phone calls by K.J. on the evening in question was noted by the trial court as instrumental in making this credibility determination, especially in contrast to the phone record evidence disputing D.L.'s allegations and the testimony of K.J. that she had no access to a phone and made no call. There is nothing arbitrary, unconscionable or unreasonable in the trial court's reliance on such evidence in exercising its prerogative to make the credibility determination it made in this case.

{¶36} The appellant claims the fact that K.J. did not inform the police officers at the park of any rape allegation and the fact that the officers did not seem to notice anything unusual about K.J.'s appearance or demeanor at the park, supports D.L.'s version of events and conclusively impeaches K.J.'s later claim of rape, which was not made until several hours later, after volleyball practice and after confronting her father. However overturning the trial court's decision on this basis would be merely substituting our own credibility determination of the witnesses based upon the words of a transcript for that of the trier of fact who

observed the witnesses testifying in person at the trial, and worse, could result in deciding the case based solely upon the preconceived and artificial notions of an appellate court as to how a juvenile rape victim must behave in the first hours immediately following a sexual assault.

{¶37} In sum, as previously stated, it is only in the exceptional case in which the evidence weighs heavily against conviction that we reverse a conviction and grant a new trial. We do not believe that the evidence presented here constitutes such an exceptional case. Thus, we conclude that the decision of the trial court to adjudicate D.L. as a delinquent child for committing the offense of rape was not against the manifest weight of the evidence. D.L.'s first assignment of error is overruled.

{¶38} For all these reasons, the judgment of the trial court is affirmed.

*Judgment Affirmed*

**PRESTON, J., concurs.**

**/jlr**


**ROGERS, J., Concurring in Part and Dissenting in Part.**

{¶39} I must respectfully dissent from the majority's disposition on the first assignment of error.

{¶40} When an appellate court analyzes a conviction under the manifest weight standard it must review the entire record, weigh all of the evidence and all

of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith*, 80 Ohio St.3d 89 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis sic.) *Thompkins* at 387, citing *Black's Law Dictionary* 1594 (6th Ed.1990).

A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. *Id.*

{¶41} R.C. 2907.02(A)(2) defines rape as "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶42} In the case sub judice, I would find that the delinquency adjudication was not supported by the manifest weight of the evidence. Given the parties' stipulation as to the sexual conduct, the only issue for the juvenile court was

-18-

whether D.L. used or threatened force. The trial judge explained that his delinquency by reason of rape adjudication focused on the conflicting testimony regarding the timing of the last conversation between K.J. and D.L. He found K.J.'s story that the final conversation occurred via Facebook around 3:00 p.m. on August 8, 2010 to be more credible than D.L.'s testimony that he received a phone call around midnight on August 9, 2010 because K.J. testified that she did not have access to a phone and therefore could not have made the phone call. Because of this determination and the size differential between D.L. and K.J., the trial court concluded that the sexual conduct was achieved with the use or threat of force.

{¶43} The issue of the timing of the last conversation is immaterial. Regardless of whether the last conversation was via Facebook or a telephone call, K.J. and D.L. both decided to sneak out of their homes and meet up at the park. I think the trial court placed an inordinate amount of importance on this issue in light of the overwhelming amount of evidence that supports D.L.'s defense.

{¶44} The testimony of two officers corroborated D.L.'s testimony that the sexual conduct was consensual. Both officers testified that nothing seemed out of the ordinary. Officer Salyer further testified that when he arrived at the scene both K.J. and D.L. were standing on the sidewalk together and then attempted to hide from him by going behind a building. He further testified that D.L. approached

him first while K.J. remained hidden. He also testified that K.J. did not seem upset, was not crying, and did not have red marks on her.

{¶45} The only evidence presented by the State as to the issue of force was K.J.'s testimony, which was uncorroborated by any other testimony or physical evidence. K.J.'s testimony fell far short of establishing beyond a reasonable doubt that she was forcibly raped. She never explained why she tried to hide from the police within minutes of allegedly being raped, nor did she explain why she failed to tell Officer Salyer about the rape when he took her home, but supposedly lied to him by saying that she and D.L. were just talking. Her testimony that her friends would judge her if they found out about what she did does not support a finding of rape. Her testimony that she only told her parents about the rape after they had punished her for sneaking out of the house and after her father's questioning as to what she was doing and who D.L. was does not support a finding of rape; if anything the timing of this allegation suggests fabrication. Further, if K.J.'s testimony that D.L., who weighs almost twice as much as she, held her down with his body weight by putting his hand over her mouth is to be believed, there would have been marks on her face which would have been visible to the officers when they talked to her in the park under an overhead light. Finally, the manner in which she claims to have been undressed by D.L., and that he allegedly undressed himself is incredible, if not impossible.

{¶46} It would appear that the majority would completely avoid considering the credibility of the witnesses or the weight of the evidence, rather than conduct the difficult independent analysis required in reviewing the manifest weight of the evidence.

{¶47} In light of the foregoing evidence, I would find that the greater amount of credible evidence does not sustain a finding of delinquency by reason of rape beyond a reasonable doubt.

{¶48} I am further convinced by the fact that the trial court never expressed its findings in terms of reasonable doubt, but appears to have simply found K.J.'s testimony to be more credible, as though the trial court misapplied the lower standard of a preponderance of the evidence. A finding of delinquency by reason of rape is much too serious a matter to allow any doubt as to the standard applied by the trier of fact.

{¶49} Although a new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction, this is such a case!

{¶50} Accordingly, I would sustain D.L.'s first assignment of error.

/jlr